# STACEY & FUNYAK
### ATTORNEYS AT LAW
THE GRAND BUILDING, SUITE 700
100 NORTH 27TH STREET
P.O. BOX 1139
BILLINGS, MONTANA 59103-1139

CALVIN J. STACEY
KEVIN M. FUNYAK

PHONE: 406-259-4545
FAX:   406-259-4540

January 7, 2020

Gerry Fagan
Moulton Bellingham
27 N. 27th St., #1900
Billings, MT  59101

**RE:  *Capitol Specialty Insurance Corporation v. Big Sky Diagnostic Imaging, LLC***

Dear Gerry:

I have agreed to provide expert witness testimony in regard to the above-reference matter. Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I am providing you with my expert witness disclosure by way of this letter.

## QUALIFICATIONS

After graduating from Billings Senior High in 1971, I attended the University of Oregon where I graduated in 1974. I then attended the University of Montana School of Law graduating in June of 1977 with a Juris Doctorate Degree. I returned to my hometown of Billings in June of 1977 where I have remained and have continuously practiced law since then. My practice over the last 40 years has been focused primarily, if not solely, upon the trial of litigated matters. I have been fortunate to try approximately 100 cases to verdict. My practice has and continues at the present time to include representing both plaintiffs and defendants.

I am, of course, a member of the Montana State Bar and admitted to practice in all of the United States District Courts in Montana. I have also tried cases in other states. I am admitted to both the Ninth and Tenth Circuit Courts of Appeals and as a result of trying numerous cases to verdict, have also had the opportunity to be involved in many cases on appeal to the Montana Supreme Court.

I am a member of a number of trial lawyers associations. I have been a member of the Montana Trial Lawyers Association and Association of Trial Lawyers of America since 1977.

In 2002, I was elected to the American Board of Trial Advocates. When inducted, one of the qualifications was to have tried a minimum of 20 civil jury trials to conclusion. ABOTA's primary function is to support the jury system in the United States.

In 2010, I was invited and inducted into the International Academy of Trial Lawyers. The Academy was chartered in 1954 and is limited to 500 fellows from the United States as well as fellows from over 30 countries throughout the world. At the present time, there are only five members of the Academy from Montana including the Academy's current President, Cliff Edwards of Billings.

In 2013, I was invited and inducted into the Federation of Defense & Corporate Counsel, an organization dedicated to maintaining the highest standards of competency, integrity and professionalism in the defense of civil litigation.

In 2015, I was inducted into the American College of Trial Lawyers. The College is an invitation-only fellowship of trial lawyers of diverse backgrounds from the United States and Canada.

Throughout the years, I have been listed in the Best Lawyers in Montana and Super Lawyers Mountain Region as well as in the Top 100 Trial Lawyers of the American Trial Lawyers Association. I received the "AV" rating from Martindale-Hubbell in 1993.

I have not authored any publications in the previous ten years.

The case which you have asked me to review in respect to the award of attorney fees is *Harby v. Cole and Big Sky Diagnostic Imaging, LLC.*, Cause No. DV-16-328 which was filed on or about September 14, 2016 in Montana's Second Judicial District Court which includes Butte-Silver Bow County. The Complaint alleges professional medical negligence claims ("medical malpractice") as against both defendants, Dr. Cole and Big Sky Diagnostic Imaging, LLC. As stated previously, my practice includes not only the defense of litigated civil matters but also the prosecution on behalf of plaintiffs in disputed litigated cases. During my career, I have handled many medical malpractice cases, primarily from the plaintiff's side. As it turns out, I have tried to verdict two different complicated medical malpractice cases in the last 10 years in Butte-Silver Bow County so I am not only familiar with the handling of medical malpractice cases but also have had personal experience in litigating in the venue in which the *Harby* case was to be tried. As

a consequence of handling many medical malpractice cases both in the past and currently, I believe I have a pretty good understanding of the time and expenses that can be incurred in these type of cases. There are many trial attorneys that do handle medical malpractice cases because of the fact that a great deal of time and expenses will be incurred in order to properly either prosecute or defend cases of this type. It is my opinion that they are unique and my experience tells me that there are a limited number of attorneys in Montana that are willing to litigate these cases. Throughout my career, I have dealt with most of the attorneys that not only defend these type of cases but also prosecute them. In reaching my opinions in this case, I of course rely upon my knowledge and experience in respect to the handling of medical malpractice cases in Montana.

## PREVIOUS EXPERT TESTIMONY

The following is a list of all cases, to the best of my knowledge, in which I have testified as an expert witness either at trial, at a hearing, or by deposition during the last 4 years:

1.   *The City of Missoula v. Mountain Water Company, et al.*, Montana Fourth Judicial District Court, Missoula County, Cause No. DV-14-352.

2.   *Todoroff, et al. v. City of Miles City, et al.*, Montana Sixteenth Judicial District Court, Custer County, Cause No. DV 14-129.

## COMPENSATION

I am charging $400 per hour for time spent acting as an expert witness in this case.

## FACTS AND DATA CONSIDERED

In reaching my opinions in this matter, I of course rely upon my experience as a trial lawyer in respect to the handling of litigated matters including medical malpractice cases. This would include my knowledge of the law applicable to medical malpractice actions, some of which is unique to these type of litigated cases (i.e., Montana Medical Legal Panel proceeding, statute of limitations and service of process requirements, qualifications of expert witnesses, etc.). In addition, I have reviewed certain documents and information provided to me as well as discussing the handling of this case with some of those who were involved in the defense of the litigation and oversight of the lawsuit. The documentation and information which I have reviewed includes the following:

1.   Declaration of Hannah Stone, Esq. (Doc. 64-1).

2.   Capitol Specialty Insurance Corporation's Motion for Attorney Fees and Brief in Support (Docs. 52 & 53).

3.   The Affidavit of Harland Westgate (Doc. 53-1).

4.   Second Affidavit of Harland Westgate (Doc. 62).

5.   The Third Affidavit of Harland Westgate (Doc. 66).

6.   Defendant's Response to Motion for Fee Award (Doc. 64).

7.   Capital Specialty Insurance Corporation's Reply Brief in Support of Motion for Attorney Fees (Doc. 65).

8.   Exhibits A, B & C to the Third Affidavit of Harland Westgate (Docs. 66-1, 66-2 & 66-3) which includes the Litigation Guidelines and emails.

9.   Order (Doc. 67) finding that a hearing is required to establish the fees and costs which are recoverable by Capitol Specialty Insurance Corporation.

10.  Crowley Fleck PLLP Invoices dated May 12, 2017, July 21, 2017, September 15, 2017, November 14, 2017, January 10, 2018, February 20, 2018 and April 13, 2018 (P-001201-P-001378).

11.  Eighteen banker boxes of documents related to the litigation and obtained, assembled and maintained by Crowley Fleck in Helena (Box Nos. 1857-1875) identified by way of Exhibits 1, 2 and 3 (photograph of boxes and some of their contents).

12.  Several additional boxes of Crowley Fleck file materials including files containing pleadings, correspondence, notes, memorandums, legal research, expert and fact witnesses information.

13.  Information obtained from Crowley Fleck attorney Jill Lasovich in a face-to-face meeting on January 2, 2020 at the Helena offices of Crowley Fleck.

14.  Phone conversation with Harland Westgate on January 6, 2020.

15.  Conversation with Missoula attorney Gary Kalkstein on January 2, 2020.

## OPINIONS

I will attempt to set forth a complete statement of all of my opinions and the basis and reasons for them. As stated previously, the *Harby* case is a medical malpractice action. The Complaint filed on behalf of Patricia and Greg Harby (Doc. 1-1) named two defendants, Jesse Cole, M.D. and Big Sky Diagnostic Imaging, LLC (Big Sky). The Complaint was filed by Missoula attorney Milton Datsopoulos of the Datsopoulos, MacDonald & Lind, P.C. law firm. I know Mr. Datsopoulos and his law firm and he has an outstanding reputation as a trial attorney. Any case prosecuted by Mr. Datsopoulos must be taken seriously. The Complaint brought separate actions against Dr. Cole, a licensed Montana physician (radiologist) as well as a company which he was a part owner, Big Sky. In reviewing the Complaint, the case involved some very unique issues. In addition to claims against Dr. Cole who was being sued individually for alleged failure to properly perform and interpret mammograms, Big Sky had additional claims made directly against it including claims that Big Sky's equipment were of poor quality and not reliable, that the positioning of a patient during the performance of mammography was done improperly and that Big Sky's imaging was of such poor quality that the American College of Radiology as well as the FDA concluded that Big Sky's mammography certification needed to be revoked. As a consequence, Dr. Cole retained separate counsel to represent him in respect to the claims brought against him as a radiologist, however, Big Sky was faced with not only defending the possibility that Dr. Cole would be considered an agent/employee of Big Sky but also in respect to the specific allegations made against Big Sky and the manner in which they performed diagnostic studies as well as the quality of their equipment. These allegations found in the Complaint immediately gave rise to a concern that this medical malpractice case not only involves the typical complicated and unique breach of standard and causation issues that seem to always arise in cases of this type but yet a second and much different claim involving medical equipment and procedures utilized over a number of years in regard to performing mammography. The Complaint sought damages on behalf of plaintiff Patricia Harby for the delay in diagnosing right breast cancer and also a loss of consortium claim on behalf of her husband Greg Harby.

The Complaint, consistent with Montana law, does not specific the total amount of damages claimed but upon reviewing it, there is no doubt that the damage claim was going to be significant. It is my experience that medical malpractice cases which are pursued must, due to the risk involved and costs that are expended and time spent, must have significant damages to be claimed at the time of trial otherwise the cases are rarely pursued. The fact that Dr. Cole was to some extent known in the medical community in Butte and the issues alleged in the Complaint of inadequate and improper equipment as well as failing to adhere to proper procedures when using the medical equipment are of significant

concern and involve thousands of patients of Big Sky made this case a very difficult one to defend. It is my opinion that based upon the allegations of the Complaint as well as my review of the file materials and information made available to me, this case was unique and not the typical already complicated medical malpractice action typically litigated. This was evidenced by the thousands of pages of documents that had to be assembled for review by the attorneys and paralegals employed by Crowley Fleck shown by way of the photographs marked as Exhibit 1, 2 and 3.

Crowley Fleck was contacted by Senior Litigation Specialist Harland D. Westgate on or about December 1, 2016 concerning whether or not the law firm would be able to represent Big Sky. Very little was known about the claim as apparently Big Sky was not involved in the Medical Legal Panel Hearing that had been previously conducted and required by Montana law. After Crowley Fleck determined that they had no conflict of interest preventing them from representing Big Sky, Mr. Westgate was advised that partners Jill Lasovich and Chris Oliveira would be handling the case and their hourly rate would be $240 per hour. Mr. Westgate was advised that associates would be charging $195 per hour. (Doc. 66-2). In response, Mr. Westgate accepted the hourly rates which in my opinion are reasonable for medical malpractice actions and are consistent with hourly rates charged by other attorneys in Montana handling these type of cases. Mr. Westgate also provided Ms. Lasovich with a copy of his company's Litigation Guidelines (Doc. 66-1). I have reviewed the Litigation Guidelines and Ms. Laslovich's response after reviewing them was appropriate which included sending Mr. Westgate a copy of the *Rules of Professional Conduct and Insurer Imposed Billing Rules and Procedures*, a Montana Supreme Court decision decided April 28, 2000 which governs the manner in which insurance carriers conduct business in Montana in respect to controlling the defense of litigated matters involving their insureds. Ms. Laslovich appropriately made it clear to Mr. Westgate that any Litigation Guidelines that conflicted with Montana law were unacceptable including requiring prior approval to retain experts, file motions, do legal research and sharing activity description with third party billing auditors. (Doc. 66-3). As Mr. Westgate has confirmed by way of his Affidavits as well as confirmed by way of my phone conversation with him, at no time did either he or Capitol Specialty Insurance Corporation improperly attempt to control the defense of Big Sky but instead closely monitored the defense of Big Sky with an obvious interest in not only defending its insured but reviewing the costs and expenses incurred in doing so. Mr. Westgate by both way of his Affidavits and during my phone conversation with him concluded that the attorney fees and expenses incurred by Crowley Fleck in the amount of $389,719.93 were reasonable, necessary, not excessive or redundant and were actually paid to the Crowley Fleck law firm by his company.

Mr. Westgate has been involved in the handling, one way or another, with medical related litigation since 2008. He obtained his undergraduate degrees, double majors, from the University of Delaware in 2005. He then attended law school at George Washington University graduating in 2008. At that time, he then obtained employment in the risk management area of a company that ultimately merged with his current employer and from 2010 forward has been extensively involved in the handling of claims involving all types of medical malpractice issues including radiology claims.

In addition to his educational and work experience, Mr. Westgate has been involved in the medical field to some extent ever since high school. He has volunteered as an emergency medical technician and with this background as well as his legal education, he wanted to stay active in both fields thus it has worked out well for him to be involved insurance claims involving medical negligence issues. Since the *Harby* case involved issues relate to radiology and Mr. Westgate had experience in those type of cases, he knew based upon the allegations found in the Complaint that the case was unique and would pose many different types of issues in the defense of the company's insured, Big Sky.

I have confirmed with Mr. Westgate that throughout the handling of the case by Crowley Fleck, consistent with the Guidelines, he would personally receive and review the Crowley Fleck invoices for services rendered. These invoices state specifically the date work was performed, the identity of the person performing the work, a description of the work performed, the amount of time spent and the amount billed. Mr. Westgate advised me that he has always been the person responsible for reviewing invoices of this type regardless of where the litigation may occur. Mr. Westgate told me that he reviewed all of the Crowley Fleck bills and would process them in order that they could be reviewed fully and completely by himself. If he ever found something within the bills that he would "flag", he would then further investigate and determine whether or not payment should be made. In this case, after Mr. Westgate reviewed all of the Crowley Fleck invoices, he never once had any concern about the manner in which Crowley Fleck was working on the case, the time and effort spent and finally, the total amount billed. In fact, Mr. Westgate shared with me that on several occasions, Ms. Laslovich would contact him to share with him her concerns that the costs and expenses in defending Big Sky had increased and were increasing perhaps beyond what had initially been budgeted. In fact, in a phone conversation confirmed by email on May 12, 2017, Ms. Laslovich confirmed with Mr. Westgate that her office had received copies of the Big Sky documents from Pit Printers that were going to be processed into an electronic system. Ms. Laslovich reported that over 12 banker boxes of documents had been received, most of which were separate by plastic sleeves, individual tabs and handwritten notes and that the documentation had to be scanned so that it could be organized, reviewed and reproduced during the course of the litigation which was going to be a "time-consuming and costly project". Ms. Laslovich

stated that they would "work hard to avoid duplication of efforts" but the project would require the combined efforts of two partners, two associates and two paralegals. In a follow up phone conversation on September 25, 2017, Mr. Westgate was advised by Mr. Laslovich that the expenses and costs in handling the case had increased because of the multiple areas in which expert witnesses had been consulted and retained and referencing to the documentation received from Big Sky, she described it as "a billion boxes" of documentation. Mr. Westgate appreciated these updates and understood fully and completely that in defending Big Sky, there was a tremendous amount of work that needed to be performed thus the expenses had appropriately increased.

It is my opinion that Mr. Westgate, a very experienced claims representative assigned to this case, reviewed not only how the case was being defended but also made sure that the costs and expenses incurred in the defense of Big Sky were appropriate and not excessive. This is part of his job as it is with most claims representatives assigned to litigated matters. Although a declaratory judgment action had been filed by Capitol Specialty Insurance Corporation against Big Sky concerning coverage issues, Mr. Westgate confirmed with me that at no time did he count on, expect or know that the payments made to Crowley Fleck could ultimately be recovered against Big Sky. Instead, as costs and expenses were incurred and payments were being made, Mr. Westgate did not do so with the expectation that his company would be reimbursed by Big Sky. Instead, Mr. Westgate approached this case no differently than any other case in which a defense was being provided and pursuant to his experience and training, he reviewed the work performed and the expenses and costs incurred and concluded that the Crowley Fleck invoices were appropriate and thus paid. This review by Mr. Westgate is significant in determining whether or not the Crowley Fleck expenses and costs incurred in the defense of Big Sky were reasonable. The insurance carrier responsible for making those payments with no assurance whatsoever that it would be reimbursed for the payments concluded without any question whatsoever that the invoices reflected appropriate, reasonable and necessary work performed on the case. It is my opinion that this is a significant factor in and by itself.

Crowley Fleck started working on the defense of Big Sky on December 2, 2016. Crowley Fleck worked on this case until March 14, 2018 when the case had been dismissed with prejudice with Big Sky paying nothing to the Harby's. This result is obviously an excellent result that is rarely achieved, and it is my opinion that the result was achieved due to the efforts of Crowley Fleck in defending what I have described as a unique and complicated medical malpractice action.

One of the unique aspects of this case was that although it initially appeared that there was no conflict of interest between Dr. Cole and Big Sky, as the case developed, there were significant differences in the way the defenses had to be handled and to some extent, issues

arose. In a typical case, there is rarely a problem in determining exactly who your client is so that you can not only report to your client but with your client's assistance, defend against the allegations made against he/she or in this case, Big Sky. The billing records of Crowley Fleck reveal that substantial initial work was performed in trying to not only determine the status of the case and obtain information concerning the allegations found in the Complaint but also develop an attorney-client relationship with Big Sky and identify who at Big Sky would be the client's representative. Dr. Cole, as mentioned previously, was a part owner of Big Sky and also an individual defendant in the litigation. In reviewing the file materials, it appeared that the ownership of Big Sky, at the times alleged in the Complaint consisted of Dr. Cole and 18 other individuals and entities. A fair amount of time was spent by Crowley Fleck in determining who would be Big Sky's representative for purposes of advising concerning matters involved the case as well as obtaining direction from the client. This is not a typical issue that arises in most cases but in this lawsuit, Crowley Fleck had to spend a fair amount of time to make sure that Big Sky, a separate defendant from Dr. Cole, was informed of all proceedings in the case. In order to accomplish this task, Dr. Keith Popovich, one of the owners of Big Sky, was appointed as the "Special Litigation Contact" by the Operating Committee of Big Sky. A document was prepared by the attorneys at Crowley Fleck after many discussions and research being conducted into this unique matter reflected by Exhibit 4 which is entitled "Written Consent Of The Operating Committee Of Big Sky Diagnostic Imaging, LLC". This document was negotiated and drafted and eventually signed in February of 2017 which allowed Crowley Fleck to have an individual that they could contact and report to on behalf of Big Sky. A problem arose early on when Crowley Fleck attempted to obtain all of the relevant documents concerning Big Sky's medical equipment and medical records and the documents were not produced as there was an issue with who on behalf of Big Sky was the representative with authority to make these type of decisions. The documents at issue were voluminous and eventually are those found in the 18 banker boxes reflected in Exhibit 1. The records, when eventually obtained by Crowley Fleck, were in great disarray. Medical records for thousands of patients of Big Sky were scattered throughout the boxes and as a result, Crowley Fleck in order to properly defend Big Sky was required to spend a great deal of time and money in organizing the records and of course reviewing them in respect to the issues involved in the litigation both based upon the allegations found in the Complaint and as the case progressed, new issues would appear. This case is unique in respect to the allegations against Big Sky because as stated previously, Big Sky's certification to operate medical equipment and specifically mammography had been terminated sometime previously. Big Sky had contested those allegations and a great deal of information in that respect had to be obtained and reviewed in the defense of Big Sky. I have reviewed the billing records of Crowley Fleck in regard to establishing a relationship with Big Sky as evidenced by Exhibit 4 as well as obtaining the records involving the American College of Radiology and FDA and the time spent is reasonable and necessary.

Once it was determined that Dr. Popovich would be the primary contact person for Big Sky, Crowley Fleck provided by hand delivery a February 9, 2017 letter to Dr. Popovich setting forth the terms of the retention of Crowley Fleck in respect to the defense of Big Sky. (Exhibit 5). Crowley Fleck made it absolutely clear to Dr. Popovich that although an insurance carrier had selected Crowley Fleck to represent Big Sky, Big Sky was Crowley Fleck's "client" and the insurance company was not. Dr. Popovich was advised that Big Sky and the insurance carrier would be informed of all important developments during the course of the case and their opinions, valuations and recommendations would be provided when appropriate or requested. Dr. Popovich on behalf of Big Sky, was asked to assist when necessary and appropriate and if Big Sky had any questions, Big Sky was welcome to ask them. In the letter, the hourly rates for the partners were identified as well as for the rates for associate lawyer Carina Wilmot who began on this case initially and the rates for paralegals. The letter stated that billing statements would identify the attorneys, legal assistants or paralegals working on the case and detail those necessary expenses incurred or paid in the course of the case. Dr. Popovich was advised that an itemized statement would be sent to the insurance carrier and that the insurance carrier would review the statement and make any adjustments per their billing guidelines and would notify Crowley Fleck of those adjustments. Dr. Popovich as well as Dr. Cole signed a copy of the letter consenting and agreeing to the scope, terms and conditions of the engagement letter.

Throughout the handling of the lawsuit, Dr. Popovich was contacted on a regular basis, met with the Crowley Fleck attorneys from time to time, was supplied with detailed evaluation reports as well as being provided with any and all information relevant to the issues in the case. For example, attached as Exhibit 6 is a letter dated January 2, 2018 sent to Dr. Popovich enclosing a binder with 9 separate depositions and exhibits that had been taken in the case. Dr. Popovich was copied on status reports sent to Mr. Westgate detailing not only the status of the case but summarizing legal issues, strategy, deposition summaries and other information necessary to properly advise a client concerning the status of the litigation. Attached as Exhibit 7 is the first and last page of a 26 page status letter dated November 22, 2017 sent to Mr. Westgate but copied to Dr. Popovich which discusses the discovery and investigation accomplished since the previous July 27, 2017 status report including retention of expert witnesses, amendments to the Scheduling Order of the Court, meetings with plaintiffs' counsel, legal discussion concerning standard of care and causation issues including information concerning retained expert witnesses, a summary of fact witnesses that had been interviewed, discovery that had been completed as of that date and an analysis of the claims of plaintiffs. This status report along with status reports dated July 27, 2017, September 5, 2017, September 22, 2017 and December 8, 2017 took a fair amount of time to prepare and were all copied to Dr. Popovich as the

representative of Big Sky, all of which I believe is reasonable and necessary in defending the case.

During the course of the handling of this matter, Crowley Fleck utilized a number of different individuals from time to time. Throughout the course of the case, the only two partners that would have eventually tried this case to a jury were Ms. Lasovich and Mr. Oliveira. As stated previously, Ms. Wilmot, an associate attorney was assigned the case initially along with paralegal Juliet Hahn. The billings records of Crowley Fleck identify other individuals who have worked on this case including Ms. Chambers, an attorney with the firm who was involved in the drafting of the written consent (Exhibit 4). At some point in time, Ms. Wilmot no longer worked on the case and she was replaced by associate attorney Andrea Brady. Ms. Brady was later replaced by associate attorney Ms. Brown and one other associate attorney, Mr. Dolpy was also involved in some limited research during the course of the case. I have reviewed the billing records and have identified the work performed by the individuals described above and I do not find anything that would be considered unnecessary or duplicative of other work performed in the case that would require any substantial reduction of the amount claimed in this matter.

I have reviewed the Crowley Fleck billing records, line by line and did so both before and after reviewing the Crowley Fleck files which were made available to me for review. In doing so, I wanted to determine whether or not the entries in the billing records corresponded to work found in the files of Crowley Fleck. Throughout the Crowley Fleck files, it appears that the attorneys, from time to time, would keep extensive written notes as well as notes of any conversations that may have taken place as well as identifying the amount of time spent and to be billed. For example, Exhibit 8 is a Crowley Fleck "Conversation Notes" form prepared by Mr. Oliveira concerning a conversation which he had with Great Falls attorney Gary Zadick on May 2, 2017 at 3:33 p.m. The conversation dealt with insurance coverage issues that the Crowley Fleck firm could not become involved in but on behalf of Big Sky, was assisting Big Sky in obtaining insurance coverage counsel. This conversation was reported at .1 hours to be billed. Likewise, Exhibit 9 is the same form prepared by Mr. Oliveira concerning a two hour conversation that he had, along with Ms. Laslovich at a conference room in Butte with Dr. David Chamberlain and Dr. Chamberlain's attorney, Gary Kalkstein. I have included these exhibits for purposes of showing some of the many handwritten notes found throughout the Crowley Fleck files that look like Exhibit 10 which is the first page of the notes taken at the meeting with Dr. Chamberlain in Butte. Throughout the Crowley Fleck files, there are handwritten notes, time being reported by attorneys concerning what work is being performed, extensive memorandums and legal research all of which is reflected in the billing documents of Crowley Fleck. Based upon my review of the documentation, it appears that the work reflected in the billing statements is found in the files of Crowley Fleck.

I must respectfully disagree with some of the opinions found in the Declaration of Hannah Stone, Esq. (Doc. 64-1) in regard to her ultimate opinion that the Crowley Fleck billing statements do not reflect reasonable and necessary time and expenses incurred in the defense of Big Sky and should be reduced to the amount billed by the Browning law firm that was representing Dr. Cole in the litigation. In my review of the documents provided to me as well as my conversation with Ms. Lasovich, I do not believe that you can compare the time and expenses incurred by the Crowley Fleck firm in defending Big Sky with the time and expenses incurred by the Browning law firm in representing Dr. Cole. The issues involving Dr. Cole were limited to the extent of whether or not he breached the standard of care for a radiologist. On the other hand, Big Sky was not only faced with the possibility of Dr. Cole being determined an employee/agent of Big Sky thus having to defend the radiologist issues but also all of the other claims that were referenced in the Complaint filed in the case including issues with the American College of Radiology, FDA and the manner and procedures utilized by Big Sky when performing mammography. As stated previously, a great deal of additional work was performed on behalf of Big Sky including locating, assembling, organizing and reviewing 18 banker boxes of documents which were later provided to the Browning law firm. I have not been provided with the Browning billing records for review but based upon my review of this matter, I am of the opinion it is not appropriate to compare the bills of two separate law firms when the work performed by each was much different.

The Court, by way of its Order, (Doc. 67) identified the nonexclusive factors to be considered in the typical case in which the reasonableness and necessity of attorney fees and costs is to be analyzed. However, as the Court noted, this case is a little different in that Capitol Specialty Insurance Corporation is seeking reimbursement of attorney fees and costs that have been incurred and paid in the defense of Big Sky rather than reasonable attorney fees and costs being awarded to a prevailing party. The nonexclusive factors that I believe are significant in this case and which have been identified by the Court include the fact that Capitol Specialty Insurance Corporation, as reflected by the Affidavits of Harold Westgate, would review the billing records and would obviously have a significant interest in making sure that the billing invoices were reasonable and necessary before paying them. Throughout the course of the case, there was no guarantee that Capitol Specialty Insurance Corporation would be reimbursed any of the attorney fees and expenses which it was incurring in the defense of Big Sky. As a consequence, after reading the Guidelines, discussing this issue with Mr. Westgate and reviewing all of the materials made available to me, it is my opinion that had Capitol Specialty Insurance Corporation determined at any time that the attorney fees and expenses being incurred were excessive, those issues would have been raised at that time. Since no issues were raised, Capitol Specialty Insurance Corporation concluded that the attorney fees and expenses were reasonable and necessary and as stated previously, this is a significant fact.

Additionally, Big Sky was advised from the beginning to the conclusion of the case as to what work was being performed, why the work was being performed and to some extent the cost. Dr. Popovich was contacted on numerous occasions both by correspondence/email as well as in person to discuss the case. Big Sky was aware of what experts were being retained and why it was necessary to do so. In addition to the periodic status letters copied to Dr. Popovich on occasion, other updates would be produced. On February 20, 2018, Ms. Laslovich sent an email to Dr. Popovich discussing what experts were going to be disclosed on behalf of Big Sky before the March 5, 2018, the expert witness disclosure deadline. In that email, Ms. Laslovich discussed identifying Lori Gittens, a mammography technician in Helena to discuss the standard care of opinions regarding performance of mammographs by Big Sky technician Heidi St. Pierre. Additionally, Dr. Gadie, a medical oncologist, from Seattle, Washington along with Dr. Ben Andersen, a surgical oncologist also from Seattle, would be offering causation and damage opinions. Kyle Jacobson, an economist from Colorado would be responding to economic damage evidence that may have been offered by the plaintiffs. The email also discusses the designation of a radiologist in conjunction with Dr. Cole as well as the fact that throughout the course of the litigation, since the medial equipment of Big Sky was at issue and under attack, physicist Dr. Jon Erickson from Kansas City was identified as a potential expert concerning the maintenance and performance of the mammography equipment.

It is my opinion, based upon my review of the documentation made available to me that Big Sky was aware during the course of the litigation as to what legal work was being performed by Crowley Fleck and agreed to the work being performed. In respect to Ms. Laslovich's email to Dr. Popovich dated February 20, 2018 described above, Dr. Popovich responded the following day at 2:13 p.m. indicating that he agreed with the "approach proposed regarding expert witnesses" and thanking her for the update and information. Again, throughout the handling of this case, documents were supplied to Big Sky through Dr. Popovich and others and the billing statements identify Dr. Popovich's name throughout in reference to telephone conversations, correspondence and face-to-face meetings which occurred throughout the case (i.e., entries dated 12/12/16, 1/4/17, 1/12/17, 1/30/17, 2/2/17, 2/4/17, 4/3/17, 4/13/17, 4/18/17, 4/19/17, 4/25/17, 4/27/17, 5/1/17, 5/2/17, 5/3/17, 5/5/17, 5/18/17, 5/9/17, 5/10/17, 5/16/17, 5/24/17, 5/25/17, 6/6/17, 6/8/17, 6/13/17, 6/29/17, 7/26/17, 8/8/17, 8/10/17, 9/5/17, 9/13/17, 10/26/17, 2/5/18, 2/28/18, 3/2/18 and 3/14/18). Throughout my review of the file, it is my opinion that Big Sky was advised continuously throughout the course of the litigation as to all relevant issues and understood what work was being performed by Crowley Fleck in the defense of Big Sky. I did not find any indication in the file that Big Sky, at any time, was concerned in the way it was being defended by Crowley Fleck or expressed any concerns whatsoever concerning the

costs and expenses which were substantial evidenced by the amount of work being performed and the reality of having to retain numerous expert witnesses necessary to defend Big Sky in regard to the medical malpractice claims. Also throughout the billing records there are references to contact with counsel for Big Sky in respect to the declaratory judgment action and again, there is no indication in the file materials that at any time there was any concern about what work was being performed, why the work was being performed and the cost and expenses incurred in the defense of Big Sky.

In respect to the retention of expert witnesses by Crowley Fleck throughout the handling of the case, it is my opinion that the work performed was necessary and reasonable and appropriate in order to properly defend Big Sky. Numerous expert witnesses were consulted, some of which were retained and others not. It is extremely important in cases of this type to not wait until expert witnesses have been identified by the Plaintiff and then attempt to identify expert witnesses. Instead, in the defense of these cases, expert witnesses need to be identified and retained early on. This is not only important in respect to later identifying them as expert witnesses but also in the completion of discovery by way of written and oral discovery procedures. In this case, some of the expert witnesses contacted and retained included, Dr. Ben Anderson, Dr. Jon Erickson, Dr. Bradley Dick, Dr. V. K. Gadi, Lori Gittens, Kyle Jacobson, Dr. Christoph Lee, Dr. Suzanne Shaw, Dr. Edward Sickles and Dr. Bruce Schroeder. In medical malpractice cases, expert witnesses are not only required but in many cases are the basis upon which juries decide standard of care and medical causation issues. A great deal of time must be spent with expert witnesses and it is my practice as well as the practice of most attorneys involved in medical malpractice cases to meet fact-to-face with expert witnesses to not only discuss the merits of the case and the scope of their expert witness testimony but to determine whether or not the expert witness is one who you want to present to the trial jury on behalf of your client. That determination can only be made prior to trial and preferably prior to the retention of the expert witness by meeting with he or she in person. Unfortunately, in medical malpractice cases, although there may be some local experts utilized by both the plaintiff and defendant, in most cases, expert witnesses are retained from outside the State of Montana. In dealing with medical experts, I have found that it is highly unusual not to meet with an expert witness and I must respectfully disagree with any suggestion that doing so is excessive or unnecessary. I have confirmed with other attorneys that a face-to-face meeting is not only necessary but required in medical malpractice cases.

The billing invoices reflect time spent meeting with fact witnesses and conducting discovery. In reviewing the Crowley Fleck files, I found that the time reported is reflected in the documents which I have reviewed and does not appear to be unreasonable in any respect.

In addition to the nonexclusive factors to be considered in determining the appropriate award of fees and costs in this case, the Court has referred to the *Plath* factors that the Montana Supreme Court has identified in determining the reasonableness of fees and costs. Those factors have been addressed in the Declaration of Hannah Stone, Esq. (Doc. 64-1). These nonexclusive factors have also been considered by myself and the following are my opinions in respect to the nonexclusive factors of *Plath*.

### The Amount and Character of Services Rendered

As stated previously, I have attempted to not only look at each entry found in the Crowley Fleck billing statements (P-001201-P-001378) in order to consider the amount and character of services and time rendered but also in conjunction with that review, I have examined the Crowley Fleck file materials to determine whether or not the time and fees shown in the billing statements were necessary and reasonable. This was a medical malpractice case that as I have stated previously, included unique issues directed against Big Sky concerning medical equipment that had been prohibited from further use by the American College of Radiology and the FDA. The type of services rendered in this case, based upon the these type of allegations, was beyond that in a typical medical malpractice action. As a consequence, the amount and time spent from the beginning in attempting to determine who from Big Sky would be the Big Sky representative or client in this matter to the location of relevant records for review and the continued defense of the case throughout was time spent that may not necessarily be incurred in other cases. The number of complex issues in the case demanded that competent representation be provided to Big Sky. Throughout the handling of the case, it was known that a declaratory judgment action had been brought to determine whether or not Big Sky had insurance coverage available for not only to cover the costs and expenses of the defense but the payment of any settlement or verdict that may be rendered against Big Sky at a later date. Fortunately, Big Sky was not subjected to a trial and possible verdict and judgment that based upon my review of the file materials could very easily have happened. The amount of the verdict is obviously unknown but in reviewing the documents, at some point in time, the fear of an award of punitive damages was very real. All of this stems from the allegations found in the Complaint which involve not only Mrs. Harby but thousands of other patients of Big Sky. Throughout the handling of this case, counsel was required to make sure that in defending Big Sky, the defense was proactive but at the same time taking into consideration any weaknesses that Big Sky may have had, had this case gone to trial in Butte, Montana. Ms. Stone by way of her Declaration states that it is her opinion a portion of the time and fees shown in the statements is redundant and excessive requiring a downward adjustment in the fee claim. In my review of the file materials, I cannot agree with that conclusion. The file materials reflect that a great deal of time was spent in the defense of Big Sky in analyzing issues such as whether or not Dr. Cole was an agent/employee of Big Sky and if

so, the effect that would have on the defense of the case as well as legal issues concerning loss of chance damages, experts, venue and standard of care. As for case strategy and research, every case requires a great deal of time in respect to how the defense will be presented and in this case, with the expert witnesses that had been consulted and retained, there was definitely need for a great deal of time in which to decide how to defend the case, all of which was shared with Big Sky directly through Dr. Popovich. I do not agree with Ms. Stone's conclusion that the amounts reflected in the billing sheets for this type of work exceeds that "typically incurred in similar matters in which no novel issues are presented, no motion practice is engaged in, and no trial takes place." Instead, after reviewing the Crowley Fleck files, it is my opinion that the time spent was reasonable and necessary and accurately reflects the amount and character of services and time rendered in the defense of Big Sky which was eventually dismissed from the litigation with prejudice without having to pay anything.

### Labor, Time and Trouble Involved

The Crowley Fleck firm began work on this case in December of 2017 and concluded with the dismissal with prejudice of its client from the litigation in March of 2018. The Court, by way of its initial Scheduling Order, set trial in the case for November 26, 2018. All discovery was to be completed by May 4, 2018 with expert witnesses to be identified in the early months of 2018. Plaintiffs identified their expert witnesses and shortly after the case settled, Big Sky would have had to identify and disclose its expert witnesses. All of the work in preparation for that disclosure had been completed and was necessary.

It is my opinion that the time involved in the defense of Big Sky was reasonable as reported in the billing statements of Crowley Fleck and there was certainly "trouble" involved in this case in the defense of the litigation on its merits as well as some of the initial issues concerning exactly who was Crowley Fleck's client and who they could report to and rely upon in obtaining documentation and eventually defending the case. Although nine depositions were completed and no dispositive motions were filed, this does not in any way suggest that the labor, time and trouble involved in this case was anything other than what is reflected in the Crowley Fleck billing records. A great deal of work was performed by the attorneys of Crowley Fleck in preparation of expert witness disclosures as well as determining the facts of the case. What was unique in this lawsuit was once again, the allegations concerning the medical equipment utilized by Big Sky over a number of years and the problems that were associated with its use and the manner in which the equipment was used (i.e., positioning of patients).

## Character and Importance of the Litigation

I must respectfully disagree with Ms. Stone's Declaration in which she states that the character of the underlying litigation was "a relatively straightforward professional negligence claim, and a straightforward loss of consortium claim." Not much time was spent dealing with the loss of consortium claim but instead the time was spent with what I consider to be a unique and complicated medical malpractice claim. It is not in every medical malpractice case that a medical expert with a physics background like Dr. Jon Erickson is retained as an expert witness. Dr. Erickson was Board Certified by the American College of Radiology in Diagnostic Radiologic Physics and Nuclear Medical Physics. Dr. Erickson was retained in May of 2017 and provided with imaging from Big Sky for review as well as documents from Big Sky concerning Quality Control and of course documentation related to the investigation by the American College Radiology which occurred in approximately 2013. As with most of the expert witness consulted or retained by Crowley Fleck, the file material reveals extensive communications with the expert witnesses including transcripts of conversations between counsel and expert witnesses, all of which was going to be utilized when disclosing expert witnesses and their reports. It is my opinion that the time spent as reflected in the billing records of Crowley Fleck in regard to consulting and retaining and working with expert witnesses was reasonable and necessary in light of the character and importance of defending Big Sky. I would not know how to reduce the amount of time reflected in the billing statements of Crowley Fleck for work devoted to expert witnesses and as I stated previously, I do not agree with the suggestion that it is unnecessary and inappropriate to attend meetings with expert witnesses outside the State of Montana. It is my experience that Montana practitioners who handle medical malpractice cases prefer to meet face-to-face with expert witnesses.

## Amount of Money or Value of Property Affected

I am not sure what the total amount of damages that would have been sought in this case would have been but I do know from experience that medical malpractice cases are not prosecuted unless there are significant damages to be recovered. Documents reflect that plaintiffs were seeking $204,000 in medial expenses along with other miscellaneous special damages as well as non-economic damages. In medical malpractice cases in Montana, the constitutionality of the cap on non-economic damages is an issue that is always discussed but at this point in time it is my opinion that neither counsel for plaintiffs or defendants know whether or not the Montana Supreme Court will conclude that the cap is constitutional. In many medical malpractice cases, non-economic damages claimed exceed the statutory cap and in fact in many of those cases, they are settled in excess of the statutory cap. In any event, the amount of money at issue in this case was significant and

as the case developed, there may have been an increase in the amount of damages and also in respect to the category of damages claimed (i.e., punitive damages).

### Professional Skill and Experience Called For

As I have repeatedly stated, I must respectfully disagree with any suggestion that this litigation involved a straightforward medical malpractice claim and did not present any unique litigation issues that required the skill and experience of those attorneys that handle these type of cases on a routine basis. Instead, not every trial attorney in Montana is equipped to defend a case such as this one brought by the Harbys. In my experience there are a few attorneys in Montana that specialize in the defense of medical malpractice cases and Crowley Fleck is one of those firms. As I reviewed the case file materials, it was rather easy to conclude that this case, like most cases, involve unique issues requiring time spent researching and analyzing them by those attorneys experienced in the defense of medical malpractice cases. It is my opinion that Crowley Fleck had the professional skill and experience required in order to defend Big Sky.

### Attorney Character and Standing

There is no dispute concerning the character or standing of any of the attorneys or employees of Crowley Fleck that worked on this case. I have had legal dealings with both Ms. Laslovich and Mr. Oliveira and consistent with Ms. Stone's Declaration, there is no basis to question the standing of these attorneys in the legal profession as they are competent, experienced and knowledgeable attorneys.

### Results Secured

The result achieved by Crowley Fleck is somewhat unique. Without the filing of a dispositive motion for summary judgment on behalf of Big Sky, experienced trial counsel for the Harbys was willing to dismiss Big Sky with prejudice without the payment of any money to the Harbys. In reviewing the case materials as well as discussing this case with Ms. Laslovich it is my opinion that the work performed in preparing the defense of Big Sky led to the decision of Plaintiffs' counsel to voluntarily dismiss Big Sky from the litigation with prejudice and not even attempt to obtain any compensation in exchange for the dismissal. The result achieved on behalf of Big Sky was outstanding and could not have been any better. However, to obtain that favorable result, the time and effort spent by Crowley Fleck in defending Big Sky was necessary and provided the basis as to why the dismissal was achieved.

In summary, it is my opinion that the amount of attorney fees and expenses incurred by the Crowley Fleck firm in the defense of Big Sky were reasonable and necessary. In reviewing the billings records, obviously there are some entries in which multiple attorneys/paralegals may have worked on the case, on the same day, on same or different issues. To suggest that when work was performed in this fashion it was excessive and redundant, one would have to have some significant factual basis to support that claim. I did not find any significant factual basis to make that type of conclusion. Instead, the Crowley Fleck files revealed that the work billed for was actually done and the detail in preparing the bills was exceptional so that upon review, if there was any question concerning the amount billed, those who would be reviewing the bills would be able to make that determination. I could find no evidence that there was any attempt to overbill for work performed in this matter and when I discussed that issue with Mr. Westgate, he confirmed that at no time did he have any concern that this case was being handled inappropriately. Mr. Westgate is fully aware that there are some situations where excessive and unnecessary legal work is performed and when he has seen that in the past, he explained to me that he brings those concerns directly to the attorneys involved. In this case, however, he never once had any concern of that type and was fully confident that the work performed was reasonable, necessary and not excessive or redundant. The best an attorney can do in reporting time is to be as accurate as possible. In reviewing the Crowley Fleck billing records, the detail of information was more than adequate to fully understand what work was being performed and after reviewing the files, why the work was being performed. Crowley Fleck had procedures in place so that when time was spent working on the file, it was reported as accurately as possible. Full and complete explanations are found in the billing records for work performed. One example of the type of detail that was provided in the billing records to support the time spent is the entry of December 13, 2017 by Mr. Oliveira in which he reported spending 2.30 hours traveling from Missoula to Helena after the deposition of Mrs. Harby. Typically, that drive does not take that long but Mr. Oliveira reported in the billing record that it was due to "a snowstorm". Also, in reviewing the billing records, I noted that on some occasions time entries for some of the attorneys indicating what work was being performed was not even billed. For example, on January 29, 2018, Ms. Lasovich reported having a telephone conference with Mr. Westgate regarding expert reviews and that she had spent .70 hours doing so. However, in the billing record, the amount reported to be billed was "$0.00". (P-001363). On that same date, Mr. Oliveira reported .70 hours spent with a conference with expert witness Dr. Shaw and discussing her review of the mammograms. However, Mr. Oliveira did not bill any of that time. There are other entries of this type which suggests to me that Crowley Fleck was aware of the billing requirements and did not in any way attempt to overbill for work performed in this matter. I cannot agree that there is any significant evidence of excessive or redundant billing by members of the Crowley Fleck firm.

In Defendant's Response to Motion For Fee Award (Doc. 64) as well as the Declaration of Hannah Stone, Esq. (Doc. 64-1), there is a list by categories of certain work performed by Crowley Fleck, the total number of hours that relate to each category and the total amount of fees charged. I have not personally gone through the billing records of Crowley Fleck to determine whether or not the categories are appropriate and the amount of hours and fees are accurate. However, in reviewing the categories along with the total hours and fees identified and comparing them with the Crowley Fleck files and my understanding of how the case was defended, I do not believe that any of the categories reflect excessive hours or fees. Throughout the handling of this case, time was spent reviewing medical records and perhaps more importantly, documents found within the 18 banker boxes reflected in Exhibit 1 and preparing those records for review by expert witnesses and analyzing the issues involved in the case and very importantly, discussing how the case would be defended. Communications with counsel for Dr. Cole took place and were necessary as well as communications for counsel for the Harbys. Those entries are obviously reasonable and necessary.

One of the categories included reporting to Big Sky's insurance carrier. It is my opinion that the time spent reporting to the insurance carrier was reasonable and necessary and more importantly, from my review of the file materials, all of this information was shared with Big Sky. When initially taking on the task to review the reasonableness and necessity of attorney fees in this case, one of my concerns was whether or not Big Sky should be obligated to pay for "communications" or what are typically referred to as status reports with the insurance carrier for Big Sky. However, as I reviewed the file, it became clear to me that these communications with the insurance carrier were shared with Big Sky and provided Big Sky with the same information necessary for it to evaluate the case and be properly defended. Status reports were copied to Big Sky (i.e., Exhibit 7) and depositions and other discovery materials were submitted to Big Sky for its review as well. (Exhibit 6). Crowley Fleck early on in the litigation provided by hand-delivery its February 9, 2017 engagement letter to Big Sky advising of the terms of its representation of the company including setting forth the hourly rates that were going to be charged by Crowley Fleck and what work was going to be performed. (Exhibit 5). Throughout the handling of the case, decisions concerning the strategy to be employed in the defense of the case were shared with Big Sky and in all cases it appears to me that Big Sky consented and agreed with the defense strategy which included the utilization, employment, retention and disclosure of expert witnesses. Therefore, I am of the opinion that the communications between Crowley Fleck and Big Sky's insurance carrier as well as with others were reasonable and necessary and should not be deducted from the amount of attorney fees claimed in this matter.

As for experts, this category indicates that there were 232.7 hours spent with experts for a total of $50,941. Based upon my review of the number of expert witnesses consulted in this case from the beginning of the litigation until it was dismissed with prejudice and the time spent preparing expert witnesses for ultimate disclosure, the amounts reflected in the billing sheets were reasonable and necessary.

Finally, in regard to both written discovery and the taking of depositions, the hours that are reflected in the billing sheets appear to be accurate in respect to time actually spent in regard to discovery issues and I do not find that a total of nearly $85,000 spent in respect to discovery in this case is unreasonable. Medical malpractice cases require a fair amount of discovery and especially when as in this case, the medical malpractice claims directed against Big Sky were unique and much different than in other cases and different than the claims being made against its co-defendant Dr. Cole. Depositions take time to prepare for and in a medical malpractice claim, additional time seems to always be necessary.

It is my opinion, based upon all of the materials available to me and taking into consideration the *Plath* nonexclusive factors as well as the other safeguards in place in this case involving the insurance carrier's ability to review and question attorney fees and costs, the amount of attorney fees and costs requested by Capitol Specialty Insurance Corporation which I understand have been paid in full on behalf of Big Sky are reasonable and necessary. I respectfully disagree with a conclusion that the attorney fees and costs should be reduced to the amount billed by the Browning law firm in respect to the defense of Dr. Cole. I have not had the opportunity to review the timesheets and billing invoices for the Browning law firm or their file materials but to conclude that those amounts establish a reasonable and necessary attorney fees and costs amount appears to me to be unsupported by the documents which I reviewed which included the Crowley Fleck files and information which I received from those involved in the handling of the litigation. The result which was achieved in this case was excellent and therefore Big Sky avoided having to pay any additional money in regard to settlement or a verdict/judgment that may have been reached or rendered in this case. In reviewing the billing documents of Crowley Fleck, I am of the opinion that the time reported was actually spent by the timekeepers identified in the billing invoices and I cannot state that any of the time spent was unnecessary, redundant or duplicative to the extent that it should be reduced.

Sincerely yours,

Calvin J. Stacey
CJS:trl





EXHIBIT

1







# FCRm QUALITY CONTROL

CNR/PHANTOM (WEEKLY)

MAINTENANCE/CORRECTIVE ACTION LOG

PRINTER (WEEKLY)

MONITORS (WEEKLY)

DAILY/WEEKLY CHECKLIST

MONTHLY/QUARTERLY/SEMIANNUAL CHECKLIST

VISUAL CHECKLIST (MONTHLY)

REPEAT ANALYSIS (QUARTERLY)

COMPRESSION (SEMI-ANNUAL)

IP FOG (SEMI-ANNUAL)

PHYSICIST REVIEW (YEARLY)

ACR DOCUMENTS

MQSA DOCUMENTS



tabbies®

**EXHIBIT**

3

### WRITTEN CONSENT

### OF

### THE OPERATING COMMITTEE

### OF

### BIG SKY DIAGNOSTIC IMAGING, LLC.

The undersigned, being the Operating Committee of **BIG SKY DIAGNOSTIC IMAGING, LLC**, a Montana limited liability company (the "Company"), do hereby waive all notices, statutory and otherwise, and do hereby act by this Written Consent to adopt, approve, consent to and ratify the following resolutions and do hereby consent to the taking of the actions herein set forth. Capitalized terms used but not defined in this Written Consent shall have the meanings given to them in the Operating Agreement of the Company, dated as of March 15, 2006 (the "Operating Agreement").

1.      **Appointment of Dr. Keith Popovich as Special Litigation Contact**

WHEREAS, at a meeting of the Members of the Company held on _____, the Members duly elected the following individuals pursuant to section 7.2 of the Company's Operating Agreement to serve as the Operating Committee of the Company (collectively, the "Operating Committee"):

Raymond Kaufman, M.D.;

Gayle Sacry, M.D. (as the appointed representative of Whitehall Medical Clinic);

Keith Popovich, M.D.; and

Jesse A. Cole, M.D.

WHEREAS, the Operating Committee has authority to handle the management and affairs of the Company except for those matters which are reserved for the Members, and may delegate duties to certain Operating Managers;

WHEREAS, the Company is currently engaged in certain litigation related to a claim of alleged medical malpractice by Member Jesse A. Cole, M.D. and the Company captioned *Patricia Harby and Greg Harby v. Jesse Cole, M.D., Big Sky Diagnostic Imaging, LLC and Does 1-5* in Montana's Second Judicial District Court, Butte-Silverbow County ("Harby v. Cole");

WHEREAS, Jesse A. Cole, M.D. has retained J. Daniel Hoven of Browning, Kaleczyc, Berry & Hoven, P.C. to represent Dr. Cole's personal interests in the Harby v. Cole litigation;



EXHIBIT
4

WHEREAS, the Company wishes to engage the services of the law firm Crowley Fleck PLLP to defend the claim of alleged medical malpractice and protect the Company's interests in connection with the Harby v. Cole matter;

WHEREAS, the Operating Committee has authority to retain attorneys and wishes to delegate this authority to a single individual for purposes of coordination and efficiency;

WHEREAS, the Operating Committee agrees that Keith Popovich, M.D. is the appropriate person to have the sole responsibility to represent the Company with regards to the Harby v. Cole matter (the "Special Litigation Contact");

NOW THEREFORE, BE IT RESOLVED, the Operating Committee designates Keith Popovich, M.D. as the Special Litigation Contact in connection with the Harby v. Cole matter. The Operating Committee and any persons acting as Operating Managers acknowledge that they are delegating their assigned responsibility to engage counsel and cede sole responsibility of communicating with Crowley Fleck PLLP and any other attorneys on the Harby v. Cole matter to the Special Litigation Contact and shall have no further authority or rights with respect to the duties delegated by the Operating Committee to the Special Litigation Contact.

RESOLVED FURTHER, that Jesse A. Cole, M.D. shall not be entitled to information provided by the Company's counsel, Crowley Fleck PLLP, to the Special Litigation Contact in connection with Crowley Fleck PLLP's representation of the Company's interests in the Harby v. Cole matter.

RESOLVED FURTHER, that pursuant to Section 7.2(f) of the Operating Agreement, Jesse A. Cole, M.D. shall not be entitled to vote in his capacity as an Operating Committee Member or an Operating Manager (if applicable) with respect to any action taken by the Company in connection with the Harby v. Cole matter due to the differing interests of the Company and Jesse A. Cole, M.D. in connection with the Harby v. Cole litigation.

2.   General Authorization

RESOLVED, that, except as expressly limited herein, each of the Operating Committee, and the Special Litigation Contact is hereby authorized and empowered to do all such acts and things and to execute and deliver or file all instruments, certificates, and documents as he, she or it shall deem necessary, advisable, or appropriate in order to carry out the intent and accomplish the purposes of the foregoing resolutions, such acts or things or the execution of such instrument, certificate or document to be conclusive evidence that such person deemed the same to be necessary, advisable or appropriate; and

RESOLVED FURTHER, that any and all actions taken prior to the date of these resolutions which would have been authorized by these resolutions but for the fact that such actions were taken prior to the date of these resolutions be, and hereby are, authorized, ratified, confirmed, adopted, and approved in all respects as the acts and deeds of the Company.

This action by Written Consent may be executed in counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same document. Delivery of an originally executed signature page or pages hereto, a counterpart signature page, or a photocopy thereof transmitted by facsimile transmission or other electronic transmission, shall be as effective as delivery of a manually signed counterpart of this Action by Written Consent.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent on the date appearing opposite his or her name:

Dated: 03/FEB, 2017

Keith Popovich, M.D., Operating Committee,

Dated: _____, 2017

Gayle Sacry, M.D., Operating Committee

Dated: 2/7/17, 2017

Raymond Kaufman, M.D., Operating Committee

Dated: _____, 2017

Jesse A. Cole, M.D., Member, Operating Committee

This action by Written Consent may be executed in counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same document. Delivery of an originally executed signature page or pages hereto, a counterpart signature page, or a photocopy thereof transmitted by facsimile transmission or other electronic transmission, shall be as effective as delivery of a manually signed counterpart of this Action by Written Consent.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent on the date appearing opposite his or her name:

Dated: 03/FEB, 2017

_____
Keith Popovich, M.D., Operating Committee,

Dated: 2-6, 2017

_____
Gayle Sacry, M.D., Operating Committee

Dated: _____, 2017

_____
Raymond Kaufman, M.D., Operating Committee

Dated: _____, 2017

_____
Jesse A. Cole, M.D., Member, Operating Committee

This action by Written Consent may be executed in counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same document. Delivery of an originally executed signature page or pages hereto, a counterpart signature page, or a photocopy thereof transmitted by facsimile transmission or other electronic transmission, shall be as effective as delivery of a manually signed counterpart of this Action by Written Consent.

**IN WITNESS WHEREOF,** the undersigned have executed this Written Consent on the date appearing opposite his or her name:

Dated: _____, 2017          _____
                                     Keith Popovich, M.D., Operating Committee,


Dated: _____, 2017          _____
                                     Gayle Sacry, M.D., Operating Committee


Dated: _____, 2017          _____
                                     Raymond Kaufman, M.D., Operating Committee

Dated: _Feb 2_____, 2017             _____
                                     Jesse A. Cole, M.D., Member, Operating
                                     Committee

Christopher K. Oliveira
900 N. Last Chance Gulch, Suite 200
P.O. Box 797
Helena, MT 59624-0797
406.457.2018 direct line
406.449.5149 facsimile
coliveira@crowleyfleck.com

February 9, 2017
*Via Hand Delivery*

Keith Popovich, M.D.
Big Sky Diagnostic & Imaging
401 S. Alabama
Butte, MT 59701

***CONFIDENTIAL***
*Protected by the Attorney-Client*
*Privilege and Work-Product Doctrine*

RE:  *Patricia and Greg Harby v. Big Sky Diagnostic Imaging, LLC, et al.*
Claim No.: 182183/Cap File No.: 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
Our File No.: 019182-000019

Dear Dr. Popovich

This letter will confirm that CapSpecialty Insurance ("CapSpecialty") has retained CROWLEY FLECK PLLP (the "Firm") to represent Big Sky Diagnostic Imaging, LLC ("BSDI") in the matter of *Patricia and Greg Harby v. Jesse Cole, M.D.; Big Sky Diagnostic Imaging, LLC; and John Does 1-5*, Cause No. DV-16-328, Montana Second Judicial District Court, Butte-Silver Bow County (referred to as "the Matter"). To comply with provisions of the Montana Rules of Professional Conduct, we want to summarize the nature and scope of our engagement and the fees and expenses that CapSpecialty will be paying under the terms of the insurance policy.

First, although CapSpecialty selected this Firm to represent BSDI, the Firm will not provide any legal analysis or advice to BSDI with respect to insurance coverage related to the applicable insurance policies, or any insurance dispute which may arise in this Matter between BSDI and CapSpecialty.

Second, the Firm represents BSDI. The Firm does not represent individual members of BSDI. Jesse Cole, M.D., is a member of BSDI and the current Medical Director of BSDI. Dr. Cole is also individually named in the Matter. We understand that Dr. Cole is represented by his own legal counsel in this Matter. The Firm understands Dr. Keith Popovich ("BSDI Representative")



have been authorized by BSDI to be BSDI's contact representative(s) for this Matter. In order to avoid conflicts of interest that could arise due to the fact that Dr. Cole is a principal of BDSI and also a separately named defendant in the Matter, the Firm will communicate with BSDI through the BSDI Representatives, rather than through Dr. Cole. BSDI and Dr. Cole hereby authorize the Firm to take direction from BSDI regarding the Matter and to pass our communications to BSDI regarding the Matter through the BSDI Representative.

Third, while the insurance company selected this Firm to represent BSDI and will be paying our fees and expenses after BSDI meets its retention of $2,500. BSDI is our client in this Matter, and the insurance company is not. Should any conflict arise between BSDI and the insurance company, however, we cannot represent either in relation to that conflict (including but not limited to insurance issues discussed above). We will use our professional skills and independent judgment to represent BSDI interests in this Matter. We will keep BSDI and the insurance company informed of all important developments during the course of our representation and we will provide our opinions, evaluations, and recommendations when appropriate or requested. We invite and will ask for direction and assistance when necessary and appropriate. Should BSDI have any questions or concerns at any time, please do not hesitate to call, write, or make an appointment to come into the office for a visit.

I will be responsible for the representation of BSDI in this Matter along with my law partner Jill Laslovich and associate lawyer Carina Wilmot. From time to time, another attorney or legal assistant in the Firm may assist in the representation. Our Firm agreed to a rate of $240 per hour for partners, $195 per hour for associates and $100 for paralegals in this Matter. In addition to the time of the attorneys, legal assistants or paralegals working on this Matter, our statements will also detail those necessary expenses incurred and paid in the course of the representation. Typical expenses include court costs, fees of investigators, court reporters, and expert witnesses, copying charges, and travel costs. On a monthly basis we will send an itemized statement to CapSpecialty detailing the time we have devoted to the representation and describing the work we have done. CapSpecialty will review the statement and make any adjustments per their billing guidelines and will notify us of those adjustments. BSDI will then be invoiced for approved fees and expenses up to its retention amount.

Both BSDI and CapSpecialty have the right to terminate our representation in this Matter by notifying us in writing of the intention to do so. Similarly, upon written notice to BSDI we may withdraw from representing BSDI should circumstances arise which require or justify our withdrawal. We may do so either with BSDI consent or by leave of the court. Should our representation be terminated or should we withdraw from the representation, we will use our best efforts to arrange for the orderly transition of the Matter to another attorney.

As we are sure BSDI realizes, attorneys cannot promise a result or guarantee an outcome, no matter how skilled or resourceful the attorney. Nor can we make any reasonably accurate prediction so early in a matter about how much our representation will likely cost the insurance company because there are just too many variables, many of which we do not control.
As mentioned above, this letter is intended as a summary of the terms under which the insurance company has retained this firm to represent BSDI. It is necessarily general because it is impossible to anticipate all of the circumstances that could affect some detail, large or small, of our representation in this Matter. For that reason, we always invite BSDI's questions. We look forward to working closely with BSDI toward a successful conclusion of this Matter.

On page 4 below is a signature line for BSDI accepting this engagement. There is also a signature line for Dr. Cole to sign. After you sign and Dr. Cole sign, please return the original to me in the attached self-addressed, postage pre-paid envelope. I will then mail you a copy of the engagement letter for BSDI's file.

Sincerely,

CROWLEY FLECK PLLP

Christopher K. Oliveira

cc:   Harland Westgate, Cap Speciality Insurance (via e-mail only)

The undersigned hereby consent and agree to the scope, terms and conditions of the engagement of Crowley Fleck PLLP in this Matter as described in this engagement letter.

Big Sky Diagnostic Imaging, LLC

By: _KEITH J POPOVICH_

Its: _REPRESENTATIVE_

And by:

Jesse Cole, M.D., Member and Medical Director

RECEIVED
FEB 1 5 2017
CROWLEY FLECK PLLP

**C R O W L E Y  |  F L E C K** PLLP
ATTORNEYS

Christopher K. Oliveira
900 N. Last Chance Gulch, Suite 200
P.O. Box 797
Helena, MT  59624-0797
406.457.2018 direct line
406.449.5149 facsimile
coliveira@crowleyfleck.com

January 2, 2018
*Via FedEx*

Keith Popovich, M.D.
High Country Lung & Sleep Disorders Clinic
505 W. Park St., Suite A
Butte, MT 59701

*CONFIDENTIAL*
*PROTECTED BY THE ATTORNEY-CLIENT*
*PRIVILEGE AND WORK-PRODUCT DOCTRINE*

RE:  *Patricia and Greg Harby v. Big Sky Diagnostic Imaging, LLC, et al.*
Our File No.: 019182-000019

Dear Dr. Popovich,

Enclosed with this letter please find a binder with the following depositions (and exhibits) which have been taken in this case:

1. Michelle Proper, M.D.;
2. Kristen Janczewski, M.D.;
3. Patrick Beatty, M.D.;
4. Sue Burton, CMN;
5. Paul Siddoway, M.D.;
6. Greg Harby;
7. Patricia Harby;
8. Pamela Winstone; and
9. Heather Harby-Kelly.

If you have any questions please don't hesitate call.

Sincerely,

CROWLEY FLECK PLLP

Christopher K. Oliveira

Enclosures

**EXHIBIT**
**6**



C R O W L E Y | F L E C K PLLP
ATTORNEYS

Christopher K. Oliveira
900 N. Last Chance Gulch, Suite 200
P.O. Box 797
Helena, MT 59624
406.457.2018 direct dial
406.449.5149 facsimile
coliveira@crowleyfleck.com

Jill Laslovich
900 N. Last Chance Gulch, Suite 200
P.O. Box 797
Helena, MT 59624
406.457.2036 direct line
406.449.5149 facsimile
jlaslovich@crowleyfleck.com

November 22, 2017

*Via E-Mail Only*
Harland Westgate
Senior Litigation Specialist
CapSpecialty Insurance
1401 Wilson Blvd., Suite 700
Arlington, VA 22209
hwestgate@capspecialty.com

***CONFIDENTIAL***
ATTORNEY-WORK PRODUCT AND
ATTORNEY-CLIENT PRIVILEGE

| | |
|---|---|
| **CASE NAME:** | *Patricia and Greg Harby v. Jesse Cole, M.D., Big Sky Diagnostic Imaging, LLC & Does 1-5* |
| **INSURED:** | Big Sky Diagnostic Imaging, LLC |
| **PRMS FILE NO:** | 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 |
| **VENUE:** | Montana Second Judicial District Court, Butte-Silver Bow County |
| **TRIAL DATE:** | Monday, November 26, 2018 |

Dear Harland,

We are writing to provide a status report on the *Patricia and Greg Harby* matter. For a detailed factual background on this matter, please refer to previous case reports. We have made extensive progress since our April and July reports. Specifically, we have met with expert consultants in various medical and scientific subspecialties relevant to BSDI's defense; taken numerous depositions of fact witnesses; continued to identify additional witnesses for deposition; analyzed discovery responses and document production from Plaintiffs and Dr. Cole; responded to multiple written discovery requests from Plaintiffs; continued to analyze voluminous internal records provided to us by BSDI, including preparing chronological summaries of the medical records, ACR records, and discovery responses received to date; and identified additional factual issues which could impact the case. Additionally, we met with Plaintiffs' counsel Milt Datsopoulos to discuss the prospect of early resolution. This report summarizes the tasks

**EXHIBIT**
**7**
tabbies

we will continue to email updates as defense costs arise which are not anticipated or exceed estimates. Please do not hesitate to contact us for more information.

        Please call any time if you have any questions or concerns.

Sincerely,

CROWLEY FLECK PLLP

Christopher K. Oliveira
Enclosures sent via ShareFile link

Jill Laslovich

c (enc.): Keith Popovich, M.D.

CONVERSATION WITH: _Gary Zobick_

TELEPHONE NUMBER: _406 - 771 - 0007_

FILE NAME: _Hanley_          FILE NO.: _19-182-00019_

TELEPHONE CONFERENCE: _X_ IN-PERSON CONFERENCE: _____

DATE: _5/2/2017_     TIME: _3:33_     AM/(PM)  LENGTH: _0.1_

SUBJECT MATTER: _____

_May get a call from ~~Defense Attorney~~ Dr. Keith Popovich_

_Insurance issues. — Briefly (w/o specifics) discussed._

EXHIBIT
8

Page ___ of ___

# Christopher K. Oliveira
## CROWLEY FLECK PLLP
### Conversation Notes

CONVERSATION WITH: _Dr. David Chamberlain / Gary Kallestens_

TELEPHONE NUMBER: _____

FILE NAME: _Harby_        FILE NO.: _19-132-000019_

TELEPHONE CONFERENCE: ___ IN-PERSON CONFERENCE: _Mercury St. Medical_

DATE: _5/15/2017_    TIME: _11:00_    AM/PM   LENGTH: _2.0_

SUBJECT MATTER: _____

_Jill Caslaich, > Conference Room @_
_CEO_             _Mercury Street Medical._

EXHIBIT
9

Harley          5/15/17

· meeting w/ Dr. Chamberlain - Butte

- Med. Director                    CEO
  · yrs.                           JOL
  · Responsibilities              Gary
  · how diff from CEO? Pres?
  · Quality assurance?

- 9 yrs - Medical Director.
  → He & other members & business owners.
  → communication role.
  → 2005
  → desparate need for output imaging in
    Butte.
      · hospital considered forming outside
        entity. Busted for enurement issues.
      · got outside group medicine to get $ together &
        create group.

- Imaging Solutions.
  · leased to buy options on several machines
    not mammo.
  · hired Ease Mgmt to run the business.
  · BSDI was the LLC for the operating
    group.

- Med. Dir.
  · communication w/ members.
  · met w/ Ba rd. Relay info. back to
    members.
  · techs. could come to him w/ issues too.
    · machine is bad. Etut.

- Compensation - $2,800/ month.

- Jesse knows Anita. She recommended
  Tony.
      (1)

EXHIBIT
10

Scanned ✓