IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CAPITOL SPECIALTY INSURANCE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>BIG SKY DIAGNOSTIC IMAGING, LLC,<br><br>Defendant. | CV 17-54-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |

Presently before the Court is Plaintiff Capitol Specialty Insurance Corporation's ("Capitol") motion to recover attorney fees it incurred in defending Defendant Big Sky Diagnostic Imaging, LLC ("Big Sky") in an underlying medical malpractice case. (Docs. 52, 61.) The motion has been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B). The Court held a hearing on the motion on January 17, 2020. After considering the parties submissions, together with the evidence presented at the hearing, the Court recommends that Capitol be awarded $357,387.43 in fees and costs.

**I.  BACKGROUND**

For several years, Patricia Harby had annual mammograms at Big Sky. In 2013, Ms. Harby underwent her annual mammogram at Big Sky on September 9, and a bilateral breast ultrasound on September 12. Dr. Jesse Cole, M.D. informed

1

Ms. Harby that the examinations did not reveal any abnormal findings and she should not be concerned.

After conducting Ms. Harby's mammogram and ultrasound, Big Sky lost its American College of Radiology accreditation for mammography. On June 12, 2014, Ms. Harby received a certified letter from Big Sky advising her that the mammogram she underwent on September 9, 2013 did not meet the Mammography Quality Standards Act, and the results of the imaging were unreliable. Ms. Harby returned to Big Sky for repeat testing, which revealed that she had breast cancer.

On September 14, 2016, the Harbys filed an action against Dr. Cole and Big Sky in Montana's Second Judicial District Court, Silver-Bow County. The Harbys alleged, among other things, negligence on the part of Dr. Cole and Big Sky in failing to diagnose Ms. Harby's cancer.

Big Sky submitted the claim to its insurer, Capitol on October 28, 2016. On April 27, 2017, Capitol accepted the defense of Big Sky in the underlying lawsuit under a reservation of rights. Capitol retained the law firm of Crowley Fleck to represent Big Sky. Dr. Cole was represented by separate counsel. All claims against Big Sky in the underlying lawsuit were ultimately dismissed with prejudice on March 9, 2018.

On May 3, 2017, Capitol brought this action seeking a declaratory judgment that it had no duty to defend Big Sky in the underlying medical malpractice action, and it sought reimbursement of its defense costs. (Doc. 1). On March 18, 2019, the Court held that Capitol did not have a duty to defend Big Sky. (Doc. 50.) The Court further found that Capitol was entitled to reimbursement for its attorney fees and costs incurred in defending the underlying claim. (*Id.*) The Court directed Capitol to file a motion under Federal Rule of Civil Procedure Rule 54(d) to recoup its expenses, but stated Capitol would "not need to relitigate the issue of whether attorney fees and costs are due." (*Id.*)

Capitol subsequently filed a Motion for Attorney Fees and a Supplement to Motion for Attorney Fees. (Docs. 52, 61.) Capitol requests an award of $389,719.93 for the attorney fees and costs it expended in providing a defense to Big Sky in the medical malpractice action.

Big Sky does not contest that Capitol is entitled to reimbursement; nor does Big Sky contest that Capitol paid that amount to defend the underlying litigation. Rather, Big Sky argues the defense fees Capitol incurred were excessive. Big Sky contends the fees awardable to Capitol should be reduced to $138,000.00, the amount Dr. Cole's attorneys billed for representing him in the same case.[1]

---

[1] It appears the attorney fees for Dr. Cole were actually $155,874.50, but Big Sky argues that $16,920 in fees were incurred representing Dr. Cole before the Montana Medical Legal Panel, which did not involve Big Sky. Nevertheless,

3

## II. APPLICABLE LAW

This Court's jurisdiction over this action is based on diversity of citizenship. "In a diversity case, the law of the state in which the district court sits determines whether a party is entitled to attorney fees, and the procedure for requesting an award of attorney fees is governed by federal law." *Carnes v. Zamani*, 488 F.3d 1057, 1059 (9th Cir. 2007). Accordingly, Montana law will be applied to determine the amount of attorney fees recoverable by Capitol in this case. The procedure is governed by Fed. R. Civ. P. 54(d).

In general, Montana law provides that an award of attorney fees must be reasonable. *Folsom v. City of Livingston*, 381 P.3d 539, 547 (Mont. 2016). The reasonableness of attorney fees depends on the facts of each case, which includes consideration of the following nonexclusive factors:

> (1) the amount and character of the services rendered; (2) the labor, time and trouble involved; (3) the character and importance of the litigation in which the services were rendered; (4) the amount of money or the value of the property to be affected; (5) the professional skill and experience called for; (6) the attorneys' character and standing in their profession; and (7) the results secured by the services of the attorneys.

*Plath v. Schonrock*, 64 P.3d 984, 991 (Mont. 2003).

In accordance with the Court's order, Capitol filed a motion seeking to recover

---

much of the preparatory work in becoming familiar with the claim would have also been performed by Crowley Fleck attorneys when they initiated their defense of Big Sky.

4

all of the fees and costs it paid to Crowley Fleck to defend Big Sky. (Docs. 52, 61.) Capitol argued that it was entitled to recover all fees and costs paid, without application of the *Plath* factors. It maintained that cases which require a reasonableness inquiry all arise in "a different context where attorney fees of one party were being shifted to an opposing party." (Doc. 65 at 5.) Capitol argued that this is not a fee-shift case; rather, it is simply seeking reimbursement for Big Sky's own attorney fees and costs incurred in defending the underlying action.

Big Sky responded, and argued that Capitol was not entitled to recover all of its fees and costs. Big Sky argued that the Court should engage in a reasonableness inquiry, and consider the *Plath* factors in determining the reasonableness of the attorney fees incurred by Capitol. (Doc. 64.)

In this Court's previous order on the issue, it was determined that the *Plath* factors were applicable to this case. (Doc. 67.) The Court further advised, however, that it would consider additional factors unique to a reservation of rights case, including whether the fees and costs sought were actually paid by the insurer in the underlying action; whether the insured had the option of retaining its own counsel and then seeking reimbursement of the fees and costs paid; and whether the insured was given notice of the fees being paid to defend the case and timely objected to the amounts billed. (Doc. 67 at 10.)

///

## III.    DISCUSSION

In support of its fee request, Capitol presented the testimony of attorney Calvin J. Stacey.  Mr. Stacey has practiced for over 40 years, and has extensive civil litigation and trial experience, including both the prosecution and defense of medical malpractice litigation.  In forming his opinions in the case, Mr. Stacey conducted a thorough review of the nature of the litigation and the time and resources devoted to defending the claim.  This included traveling from Billings to Helena to meet with the Crowley Fleck attorney who was primarily responsible for the defense of Big Sky, Jill Laslovich.  He also inspected and verified the volume of documents involved in the case at the Crowley Fleck offices in Helena.  In addition, Mr. Stacey contacted the Senior Litigation Specialist for Capitol who was assigned to the Harby's claim, Harland Westgate.  Mr. Stacey also twice went over the bills submitted by Crowley Fleck to Capitol line by line, and he verified that the work billed was reflected by corresponding work product in the litigation file.

From his review, Mr. Stacey concluded that the time presented on the Crowley Fleck billing invoices was actually spent by the Crowley Fleck attorneys and staff identified, and he did not find that any of the time devoted to the case was unnecessary, redundant or duplicative.  He further concluded the amount of attorney fees and costs billed by Crowley Fleck, and actually paid by Capitol, was reasonable and necessary.

In opposing the reasonableness of the attorney fees requested, Big Sky presented the testimony of attorney Hannah Stone. Ms. Stone has been practicing for 10 years, and she currently devotes approximately 70% of her practice to insurance defense. She also has experience litigating cases alleging professional negligence, including handling pretrial matters in medical malpractice cases. Ms. Stone's review was limited to the billing statements from Crowley Fleck and Dr. Cole's attorneys, and various pleadings in the case. She was also provided a summary of Crowley Fleck's fees, which separated and totaled the fees into various categories. (Doc. 64-1 at 3.)

In Ms. Stone's opinion, the fees and costs billed by Crowley Fleck were excessive. She did not offer an opinion that any particular time entry or charge for any specific service was excessive. Rather, she believed that certain categories of service were generally excessive, and that a "global downward adjustment" was appropriate. Ms. Stone believes that an adjustment to an amount commensurate with those charged by Dr. Cole's attorneys would be appropriate.

The fees charged in this case by Crowley Fleck were certainly not modest. Even Mr. Stacey acknowledged the fees were "substantial." Nevertheless, the Court finds Mr. Stacey's testimony to be persuasive, and after applying the *Plath* factors and other relevant considerations, cannot find that the fees and costs paid in the case were unreasonable and unnecessary. But certain adjustments are appropriate.

First, application of the *Plath* factors supports the reasonableness of the fees and costs paid by Capitol. Each factor will be discussed below.

### 1. The Amount and Character of the Services Rendered

The Court has reviewed the various legal services provided by Crowley Fleck, and finds they are the type of services that are expected to be performed in litigated matters. Crowley Fleck acquired the necessary records from Big Sky. The voluminous documents and files were organized, scanned and copied, and a chronology of the records was prepared. The firm also devoted significant time to analyzing the issues in the case, researching the legal and medical issues, and preparing a strategy for defending the case. Crowley Fleck attorneys also spent time communicating with Dr. Cole's counsel, with plaintiff's counsel, and with the client, Big Sky. As with all medical malpractice cases, Crowley Fleck attorneys also devoted significant time to locating and consulting with experts and preparing expert disclosures. The firm also billed for time preparing pleadings in the case and engaged in a limited motions practice. Crowley Fleck attorneys also conducted discovery in the case by preparing three sets of written discovery, responding to one set of written discovery, and participating in nine depositions. All of these services are the type and character of work generally performed in medical malpractice cases.

Both Mr. Stacey and Mr. Westgate also attest that the amount of time spent in these areas was reasonable and appropriate. Mr. Stacey verified that the time

reported on the invoices "was actually spent by the timekeepers identified in the billing invoices," and he did not find that "any of the time spent was unnecessary, redundant or duplicative to the extent that it should be reduced." (Doc. 69-1 at 21.) After reviewing each of the Crowley Fleck invoices as the litigation was in progress, Mr. Westgate similarly concluded that none of Crowley Fleck's work on the case was "excessive, unnecessary or redundant," and he is of the opinion that the "legal work was reasonable, highly effective and professionally done." (Doc. 66 ¶ 18.)

Ms. Stone disagrees, however, and states there are multiple entries for attorney time where there are duplicate entries for the same activity. But Ms. Stone does not identify any specific entry where she believes that occurred to enable any meaningful review. Further, Ms. Stone did not have access to the Crowley Fleck files. As discussed above, Mr. Westgate had the opportunity to review the invoices as the case was progressing. Mr. Stacey also had the advantage of being able to cross-reference the time entries with the work product in the files. Both attest that they did not find any unnecessary duplication of services.

### 2. Labor, Time and Trouble Involved

Mr. Stacey testified that this was not a typical medical malpractice case, and there was significant time and "trouble" involved in the case. Mr. Stacey explained that, in addition to the typical medical negligence claim that a provider's care fell below the applicable standard of care, Big Sky also had to contend with the

allegations in the case that its mammography equipment and practices were substandard, and with the fact that its mammography certification had been revoked by the FDA and the American College of Radiology. This undoubtedly required a review of the findings and conclusions from those proceedings, and research as to the implication of the findings on the Harby's case.

These additional issues greatly expanded the scope of the claim and the relevant records involved. The records were not limited to those pertaining to Dr. Cole's care and treatment of Ms. Harby. Crowley Fleck was required to obtain and review voluminous records from Big Sky concerning its mammography services. Mr. Stacey confirmed that 18 "banker's boxes" of documents were obtained from Big Sky. These documents were reportedly very poorly organized and in disarray, requiring Crowley Fleck to devote substantial resources to organize, scan, and duplicate thousands of documents so they would be searchable and accessible, and capable of being produced in discovery.

There were also several legal issues in the case which required legal research, including Big Sky's vicarious liability for Dr. Cole's acts or omissions; the potential for individual liability of the principals of Big Sky; spoliation due to Big Sky's disposal of its mammography equipment; the potential for punitive damages; and the potential for class action claims by patients who had undergone mammography at Big Sky. In addition, there were unusual issues involved in determining an

appropriate contact at Big Sky for purposes of the litigation. As noted above, Dr. Cole, one of the owners of Big Sky, was a co-defendant in the case and represented by separate counsel. Therefore, direct communications with Dr. Cole would not have been appropriate. Ultimately, Dr. Keith Popovich, another owner of Big Sky, was appointed by the organization as the "Special Litigation Contact." Crowley Fleck then prepared a document allowing it to contact and report to Dr. Popovich on behalf of Big Sky.

Ms. Stone is critical of Crowley Fleck for researching the FDA's investigation of Big Sky and Big Sky's loss of accreditation in 2013. She is also critical of Crowley Fleck's research of legal issues which were never raised in the case, and for researching potential class action claims by other patients of Big Sky. But research of the FDA's review and the findings made therein would seem to be essential to determine what impact those findings may have on the Harby's claims. Further, becoming knowledgeable of potential legal issues involved in a case, and fully assessing a client's potential liability and exposure, are core functions an attorney is hired to perform.

Ms. Stone further points out that Crowley Fleck only responded to one set of written discovery, and only propounded three sets of written discovery. Therefore, she opined that the time billed for written discovery was excessive. But this limited analysis does not provide any basis to conclude that the time was excessive. Big

Sky does not provide any information as to the nature and extent of the written discovery served upon them, or the volume of materials that needed to be reviewed and produced in response to the discovery. As noted above, there were 18 boxes of documents obtained from Big Sky alone, containing thousands of documents. These documents would have had to be reviewed and all responsive documents produced.

### 3. Character and Importance of the Litigation

The underlying medical malpractice action was clearly important to the parties involved. The Harby's claim challenged not only the quality of the care provided by Dr. Cole and Big Sky to Ms. Harby, but also Big Sky's professional competence in providing radiological services.

In addition, the complexity of the case is demonstrated by the number and type of experts needed to defend the claim. Crowley Fleck intended to provide the expert testimony of a mammography technician, medical oncologist, surgical oncologist, radiologist, an economist, and also a medical physicist to testify concerning the maintenance and performance of Big Sky's mammography equipment. Several other experts were also consulted in the defense of the claim.

With respect to Crowley Fleck's work with the experts involved in the case, Ms. Stone is critical that Crowley Fleck attorneys traveled to meet with experts, rather than using telephone or videoconferencing services. But Mr. Stacey testified that it is the practice of attorneys who engage in medical malpractice litigation to

personally meet with potential medical experts to evaluate their suitability to testify before a jury on the particular issues in the case. Crowley Fleck cannot be faulted for doing so here.

### 4. Amount of Money or Value of Property Affected

In cases of this kind, the amount of money involved is not fixed, and cannot be determined with any degree of precision. As often occurs, the parties here disagree over the potential value of the Harby's claims. Mr. Westgate attests that he believed the Harby's case presented a reasonable likelihood of a verdict in excess of $1,000,000. (Doc. 66 at 3.) Mr. Stacey did not attempt to specifically evaluate the potential recovery in the case. He does, however, point out that Ms. Harby claimed medical expenses of $204,000, along with other special damages, as well as non-economic damages. He also believed that the case presented the potential for punitive damages against Big Sky. In short, he believed the amount of money at issue in the case was "significant."

Ms. Stone, on the other hand, points out that Ms. Harby's non-economic damages are capped under Montana law at $250,000. Nevertheless, both parties recognize that the validity of this cap has not been addressed by the Montana Supreme Court. According to Mr. Stacey, non-economic damages in medical malpractice cases often exceed the statutory cap, and many cases are settled in excess of the cap.

### 5. Professional Skill and Experience Called For

Mr. Stacey testified that there are relatively few attorneys in Montana who specialize in the defense of medical malpractice actions, with Crowley Fleck being one of the few firms which do so. The majority of medical malpractice actions are somewhat complex, and almost all require working with medical experts. As Mr. Stacey points out, this case was more complex than a typical failure to diagnose case, and presented unique medical and legal issues. The experts hired by Crowley Fleck reflect that they were prepared to present expert testimony not only on the standard of care (radiology technician and radiologist), but also on issues of causation and loss of chance (medical and surgical oncology), and economic damages. They had also retained a medical expert with expertise in diagnostic radiologic physics and nuclear medical physics to testify regarding the claims surrounding Big Sky's mammography practices and equipment. In short, the claim clearly called for a skilled litigator with extensive experience in medical negligence claims.

### 6. Attorney Character and Standing

There is no dispute concerning the character or standing of any of the Crowley Fleck attorneys who were involved in the defense of Big Sky. (Doc. 70 at 2.)

### 7. Results Secured

There is also no dispute that the results secured by Crowley Fleck were optimal. *Id.* A dismissal with prejudice, without the payment of any settlement

funds to the Harbys, is the best outcome that could have been achieved for Big Sky.

Therefore, the *Plath* factors all weigh in favor of a finding that the fees and costs incurred in the defense of the Harby lawsuit were reasonable and necessary.

### 8.    Additional Factors

Moreover, the additional factors outlined in the Court's previous order also favor a finding of reasonableness in this case. As the Court previously discussed at length, the fact that an insurer, like Capitol, actually paid the fees and costs provides strong evidence of reasonableness in cases such as this. (Doc. 67 at 7.) Several cases have recognized that an insurer providing a defense under a reservation of rights is unlikely to pay commercially unreasonable fees to defend a case when it is uncertain whether it will prevail on the coverage question, or whether it will ultimately be able to collect the fees paid from an insured. *Id.*

As discussed above, Mr. Stacey contacted the claims representative for Capitol who was responsible for the Harby litigation, Harland Westgate. Mr. Westgate is an attorney, and he has been a claims representative on hundreds of medical malpractice claims. Mr. Westgate confirmed that he reviewed every invoice from Crowley Fleck and would have flagged and investigated any item in a bill that he found questionable. But after reviewing the invoices, Mr. Westgate never had any concern regarding the manner in which Crowley Fleck was defending the case, or the amount of fees and expenses billed. Mr. Westgate also confirmed that the fees

were paid without any expectation by Capitol that it would ultimately be able to recover those expenses from Big Sky. For the reasons discussed in the Court's prior order, this factor weighs heavily in favor of finding the fees were within a reasonable range.

The Court also advised the parties that it would consider whether Big Sky had the option of retaining its own counsel, and then seek reimbursement of defense costs from the insurer. (Doc. 67 at 7-8, 10.) Here, Capitol timely and explicitly notified Big Sky that it was reserving the right to seek reimbursement of defense costs. Thus, Big Sky was free to retain its own counsel in the Harby litigation. If Big Sky believed Capitol had a duty to defend, it could have sought recovery of its defense costs. See e.g., *United Nat. Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 921 (6th Cir. 2002) ("When faced with a reservation of rights, the insured can choose to: 1) decline the offer, pay for the defense, and seek to recover on the policy; 2) decline the offer and file a declaratory judgment action; or 3) accept the offer subject to the reservation of rights."); *Century Sur. Co. v. Atweek, Inc.*, 2019 WL 1994172, at *6 (E.D.N.Y. May 6, 2019) (stating the insured is entitled to notice of reservation of rights "so it can make its choice to accept or decline."); *Newman v. Scottsdale Ins. Co.*, 301 P.2d 348, 354 (Mont. 2013) ("It is well-established that 'where [an] insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments.'") (alteration in original.)

16

The parties were further advised that the Court would consider whether Big Sky was given notice of the fees being paid, and whether any objection was made to those fees and costs during the defense of the case. (Doc. 67 at 19.) No objection was ever made to the defense costs or the manner in which Crowley Fleck defended the claim, although it appears that Crowley Fleck invoices were only sent to Capitol, and not Big Sky. Nevertheless, Big Sky was advised of the hourly rates for the Crowley Fleck attorneys, and was continually advised throughout the course of litigation of the work being performed by Crowley Fleck, and the experts who were being hired to defend the claim. But because Big Sky was not provided copies of the billing invoices, this factor does not weigh in favor of finding the fees reasonable here.

In addition to consideration of the relevant factors, the Court does not agree with Big Sky that the fees incurred by Dr. Cole in his defense should serve as a measure of what was reasonable and necessary to defend Big Sky. As Mr. Stacey pointed out in his testimony, the claims against Big Sky were much broader than the claim against Dr. Cole. Big Sky was not only required to defend Dr. Cole's care of Ms. Harby, it was required to defend its entire mammography program. Further, there is nothing to show that the division of work was equal between the parties. It appears that Crowley Fleck had the laboring oar with respect to managing the documents in the case, and consulting and retaining experts. Further, simply

comparing how many depositions each party "attended" does not provide any information as to who noticed the depositions and took the lead in questioning the witnesses. This consideration alone could lead to a large disparity in the amount of time required for medical research and preparation.

Big Sky does raise one issue, however, which warrants an adjustment here. Crowley Fleck billed 13.7 hours ($3,120) for communications with Capitol, in addition to 19.2 hours ($4,392) in fees for communications with Big Sky and Dr. Popovich. Big Sky should not be responsible to pay for communications between Crowley Fleck and Capitol, which would not have been incurred had Crowley Fleck been retained directly by Big Sky. Similarly, Crowley Fleck billed 143.5 hours ($29,212.50) for written reports to Capitol. These reports were written to comply with Capitol's internal requirements. While Big Sky did receive copies of the reports, it is highly unlikely that Crowley Fleck would have devoted this time reporting to Big Sky had they been retained directly by Big Sky. These costs were for the benefit of Capitol, not Big Sky. In fact, the 19.2 hours that were spent directly reporting to Big Sky would likely have been sufficient to fulfill Crowley Fleck's duty keep the client informed of the progress of the litigation. Therefore, a total reduction of $32,332.50 is appropriate.

/ / /

/ / /

## IV.     CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.      Capitol's Motion for Attorney Fees (Docs. 52, 61) be **GRANTED**, and that Capitol be awarded $357,387.43 in fees and costs.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 31st day of January, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge